IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **ALEXANDRA DAVIS**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **JERRAL W. JONES, DALLAS** | § | |
| **COWBOYS FOOTBALL CLUB, LTD.,** | § | |
| **JAMES WILKINSON, TRAILRUNNER** | § | CIVIL ACTION NO. 5:23-CV-00032-RWS |
| **INTERNATIONAL, LLC, DONALD** | § | |
| **JACK, JR**., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| v. | § | |
| | § | |
| **CYNTHIA DAVIS-SPENCER,** | § | |
| | § | |
| Third-Party Defendant. | § | |

## ORDER

Before the Court is Defendants Jerral Jones, Dallas Cowboy's Football Club, LTD., James Wilkinson, Trailrunner International, LLC, and Donald Jack, Jr.'s Motion to Dismiss under Rule 12(b)(6). Docket No. 12. Plaintiff Alexandra Davis filed a response to the motion (Docket No. 20), and Defendants filed a reply (Docket No. 22). The Court held a hearing on September 13, 2023. Docket Nos. 34, 42. For the reasons set forth below, Defendants' motion (Docket No. 12) is hereby **GRANTED-IN-PART WITH PREJUDICE** and **GRANTED-IN-PART WITHOUT PREJUDICE**.

## BACKGROUND

Plaintiff Alexandra Davis filed this lawsuit seeking damages for defamation, and the following allegations are taken from Plaintiff's Complaint. Docket No. 1. Plaintiff alleges that she

is the biological daughter of Defendant Jones and Third-Party Defendant Cynthia Davis-Spencer. *Id.* ¶ 13. According to Plaintiff, Jones and Davis-Spencer had an affair together while they were married to other people. *Id.* ¶¶ 9–10. Later, Davis-Spencer learned she was pregnant with Plaintiff. *Id.* ¶¶ 10–11. Davis-Spencer gave birth to Plaintiff while she was still married to her husband. *Id.* During her divorce proceedings, however, Davis-Spencer learned through a paternity test that her husband was not Plaintiff's father. *Id.* ¶ 12. Davis-Spencer then informed Jones that he was Plaintiff's biological father. *Id.* ¶ 13. Plaintiff alleges that Jones stated he would not take a paternity test or have any relationship with the child. *Id.* Jones, however, proposed an agreement to financially support Plaintiff and Davis-Spencer in exchange for confidentiality. *Id.* ¶¶ 14–16. Jones asked Defendant Donald Jack to execute the agreement (the "Settlement Agreement"). *Id.* ¶ 15.

The Settlement Agreement provided ongoing monthly payments to Davis-Spencer to support Plaintiff. *Id.* ¶¶ 16, 18. The Settlement Agreement also prohibited Plaintiff from seeking a legal adjudication that Jones was her father and bound both Davis-Spencer and Plaintiff to confidentiality. *Id.* ¶ 18. Plaintiff was a year old when her mother entered into the Settlement Agreement on her behalf. *Id.*

Prior to her 21st birthday, Plaintiff wrote a letter (the "Letter")[1] and read it to Jack at a dinner. Docket No. 1, ¶¶ 43–44. Plaintiff alleged that the Letter was a therapeutic exercise to "share her anguish about the lack of relationship with her father" and to ask "Defendant Jones for a simple

---

[1] The Letter is not dated. *See* Docket No. 12-2. Plaintiff represents that the Letter was written, and the meeting occurred, between four and five years ago. *See* Docket No. 1, ¶¶ 42–44; *see also* Docket No. 42 at 45:13–18, 46:8–13, 49:22–50:11.

meeting of any kind." *Id.* ¶ 43. Plaintiff asserts the Letter[2] was a therapeutic exercise and not a demand for money. Docket Nos. 20 at 3–4; 1, ¶ 44.

Two years later, after her meeting with Jack, Plaintiff decided "to seek legal guidance as to her rights" as "they related to Defendant Jones, parentage, and the so-called Settlement [Agreement]." Docket No. 1, ¶ 22. Plaintiff sought to "confirm biologically who her father was and establish parentage." *Id.* Plaintiff's counsel sent a letter to Jones via Defendant Dallas Cowboys's general counsel. *Id.* ¶ 23. The letter asked Jones to participate in a procedure under Texas law to establish parentage. *Id.* ¶¶ 24–26; Docket No. 1-2. The letter asked for a response within seven days or, if not, Plaintiff would "proceed with the legal process." Docket No. 1-2. Plaintiff's counsel also sent a draft of a lawsuit. Docket No. 1, ¶ 27.

Plaintiff did not receive a response from Jones or the Dallas Cowboys. *Id.* ¶¶ 27–29. Subsequently, Plaintiff filed a declaratory judgment action in Texas state court ("First Lawsuit"). *Id.* ¶¶ 27–32. Plaintiff filed the First Lawsuit in the public record, and the Dallas Morning News reported on the case before the complaint could be sealed, "attract[ing] local, national, and international attention." *Id.*

Plaintiff alleges Defendants' defamation began after the filing of the First Lawsuit. Docket No. 1, ¶¶ 33–34. First, Plaintiff alleges that Defendants distributed Jones's responsive plea to the jurisdiction from the First Lawsuit (the "Plea"), which allegedly contained false statements, to the media. *Id.* ¶¶ 34–36. Plaintiff also alleges that she was named in a letter (the "Preservation Letter") that was sent to a third party's counsel and later distributed to the media regarding the divorce proceedings between Jones's daughter, Charlotte Jones, and her then-husband Shy Anderson. *Id.*

---

[2] Defendants attached the Letter to their motion and allege that, in the Letter, Plaintiff asked Jack and Jones for "what [she] think[s] is fair" and notes it states Plaintiff "already [had] a figure in mind." Docket No. 12, ¶ 8; *see also* Docket No. 12-2.

¶¶ 37–38. Plaintiff states this letter further "propagate[d] [an] extortion narrative" and tied "Plaintiff to other supposed bad actors who were alleged to have been wrongfully seeking money from Defendant Jones." *Id.*

Plaintiff also alleges that Defendants Wilkinson and Jack made false statements, on behalf of the other Defendants, in two articles published by ESPN that falsely paint her as an "extortionist" trying to "shake down" the Jones family for money. *Id.* ¶¶ 38–42; *see also* Docket Nos. 12-43 ("the First ESPN Article"), 12-44 ("the Second ESPN Article"). Finally, Plaintiff alleges that Defendants distributed an affidavit by Jack from the Second Lawsuit (the "Jack Affidavit") to the media which contained similar language. Docket No. 1; *see also* Docket No. 12-4. Plaintiff pleads that the individual statements made in these publications—*i.e.*, the Plea, Preservation Letter, First ESPN Article, Second ESPN Article, and Jack Affidavit—are false and defamatory because she never made a demand for money. Docket No. 1, ¶¶ 55–73. Plaintiff also alleges that, considered together, the publications create a defamatory narrative. *Id.* ¶¶ 56–57, 70–71.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal where a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). For motions to dismiss under Rule 12(b)(6), a court must assume that all well-pleaded facts are true and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

The Court must then decide whether those facts state a claim that is plausible on its face. *Bowlby*, 681 F.3d at 219. The complaint need not contain detailed factual allegations, but plaintiff must plead sufficient factual allegations to show that they are plausibly entitled to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (discussing *Twombly* and applying *Twombly* generally to civil actions pleaded under Rule 8). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 673 (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

The Court addresses below the issues that arose in the parties' briefing and at the hearing, including (1) evidentiary disputes; (2) choice of law; (3) agent immunity; (4) defamation; and (5) conspiracy.

## I.    EVIDENTIARY OBJECTIONS

As an initial matter, Plaintiff objected to several exhibits[3] attached to Defendants' motion to dismiss, stating that unless the documents were "referenced in the Complaint and central to Davis'[s] claims," the Court should not consider the exhibits under the motion to dismiss standard. Docket No. 20 at 13–14. Plaintiff objected to all of Defendants' exhibits except "the publications containing the defamatory statements." *Id.*; *see also* Docket Nos. 12-18, 12-4, 12-42–12-44. Plaintiff withdrew her objection to the Letter (Docket No. 12-2) during the hearing on September

---

[3] Plaintiff objected to the following exhibits to Defendants' Motion to Dismiss: Docket Nos. 12-1–12-3; 12-5–12-17; 12-19–12-41.

13, 2023.[4] Docket No. 42 at 52:12–24. Defendants responded that Plaintiff's objections were "undifferentiated," "vague," and attempted to "improperly narrow the materials considered by the Court." Docket No. 22 at 14. Defendants did not provide specific responses regarding why documents other than the complained of defamatory statements and the Letter should be considered. *See id.*; *see also* Docket No. 42 at 52:12–24.

Plaintiff is correct. "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star*, 594 F.3d at 387. With respect to the documents attached to Defendants' motion, the Court considers the publications containing the alleged defamatory statements (Docket Nos. 12-18, 12-4, 12-42–12-44), the Letter (Docket No. 12-2), and Defendant Jack's declaration regarding the Letter (Docket No. 12-1). The remaining exhibits consist of the Settlement Agreement, additional state court filings from the First and Second Lawsuits, documents regarding Charlotte Jones's divorce, and media articles discussing the controversy that are *not* at issue in the pending motion. *See* Docket Nos. 12-3; 12-5–12-17; 12-19–12-41. The remaining exhibits do not contain alleged defamatory statements and are not central to Plaintiff's defamation claims. Accordingly, Plaintiff's remaining evidentiary objections are sustained at this stage. *See* Docket No. 20 at 13–14.

## II.   CHOICE OF LAW

This case is a diversity action where state substantive law applies. Docket No. 1, ¶ 7. Plaintiff alleges that District of Columbia law applies because, under the substantial relationship

---

[4] Exhibit 1 to Defendants' Motion to Dismiss is a sworn declaration by Defendant Jack in which he declares under penalty of perjury that the Letter (Docket 12-2) is a "true and correct copy" as "written by Alexandra Davis that was provided to [him] by Ms. Davis after she first read it to [him] at a restaurant on or about November 16, 2017." Docket No. 12-1. Because the declaration is necessary to consider the Letter, the Court overrules Plaintiff's objection to Docket No. 12-1.

test, she was domiciled in D.C. when the defamatory statements were published.[5] Docket No. 20 at 10–11. Defendants respond by arguing that Plaintiff failed to meet her burden of proving a conflict between Texas and D.C. substantive defamation law and that, absent such a conflict, the "forum's law (Texas) applies." Docket No. 22 at 8.[6]

In a diversity case, "the law of the forum state . . . governs." *Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 249–50 (5th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Under Texas choice of law principles, the law of the state with the "most significant relationship" should govern. *Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)). "Choice-of-law decisions can be resolved at the motion to dismiss stage when factual development is not necessary to resolve the inquiry." *Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 459 (5th Cir. 2016) (citing *Fortune v. Taylor Fortune Grp.*, 620 F. App'x 246, 247–48 (5th Cir. 2015)).

But "courts need not resolve apparent conflict of laws issues where no conflict actually exists—*i.e.*, where the conflict is 'false' because the result under each law would be the same." *Adi Worldlink, LLC v. RSUI Indem. Co.*, No. 4:16-CV-00665-ALM-CAN, 2017 WL 6403047, at *4 (E.D. Tex. Aug. 16, 2017), *report and recommendation adopted*, No. 4:16-CV-665, 2017 WL 4112112 (E.D. Tex. Sept. 18, 2017), *aff'd sub nom.* 932 F.3d 369 (5th Cir. 2019). "If no conflict of law exists on the issues, we need not decide which state's law applies." *Fraud-Tech, Inc. v.*

---

[5] At the hearing, the parties agreed that the choice of law issue did not need to be decided at the motion to dismiss stage. Docket No. 42 at 68:23–69:5.

[6] Defendants also explain that Rule 12(b)(6) is a federal procedural rule that governs the motion to dismiss standard in this case. *See* Docket No. 22 at 8 (citing *Klocke v. Watson*, 936 F.3d 240, 249 (5th Cir. 2019)).

*Choicepoint, Inc.*, 102 S.W.3d 366, 377–78 (Tex. App.—Fort Worth 2003, pet. denied). The two states' laws are consistent if "the result would be the same under the laws of either jurisdiction." *Playboy Enter., Inc. v. Sanchez-Campuzano*, 519 F. App'x 219, 225 (5th Cir. 2013) (citing *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 314 (Tex. App.—Dallas 2004, no pet.)). In Texas, the court "presume[s] that other states' laws are the same as its own," and therefore "the party advocating the use of a different state's laws bears the burden of rebutting that presumption." *Id.* (citing *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 n.5 (Tex. 2008)).

Following Texas's choice of law analysis, we must first determine whether a conflict exists between Texas and D.C. substantive defamation law. *See Playboy Enter.*, 519 F. App'x at 225. The parties, however, seem to agree that D.C. and Texas defamation law are the "same applicable general law." *See* Docket Nos. 35-1 at 10; 42 at 53:11–14, 53:25–56:14; *see also* Docket No. 22 at 8. While Plaintiff asserts that it "is easier to survive a motion to dismiss in D.C. than under Texas law," Defendants are correct that the motion to dismiss standard follows the federal procedural rule under 12(b)(6). Docket No. 22 at 8. Plaintiff does not demonstrate that D.C. substantive defamation law is in conflict. In fact, Plaintiff argues that her case, on the pleadings, survives a motion to dismiss under both Texas and D.C. law, and that "[l]ike D.C. law," the elements for defamation in Texas are the same. Docket Nos. 20 at 16, 35-1 at 10. Further, at the hearing, Plaintiff represented to the Court, both in testimony and in her demonstratives, that the substantive, general law in Texas and D.C. is the same. *See* Docket No. 42 at 53:11–14, 53:25–56:14.[7]

---

[7] At the hearing, Plaintiff did point out, for the first time, that "Texas has the retraction law, D.C. doesn't," in reference to the Texas Defamation Mitigation Act ("DMA"). Docket No. 42 at 68:23–69:5. However, the DMA does not require dismissal of a case where Plaintiff may have failed to

Because the parties "seemingly agree that Texas law and [D.C.] law supply the same general principles" under defamation law, there is no conflict. *See Adi Worldlink*, 2017 WL 6403047, at *5. As such, Plaintiff, as the party advocating for D.C. law, has not met her burden of "establishing that [D.C. law] differed from Texas law to overcome the presumption that it was the same as Texas's." *Excess Underwriters*, 246 S.W.3d at 53.

Since D.C. and Texas defamation law are not in conflict, the Court need not reach the substantial relationship test, and the substantive law of the forum state will apply. *See generally Canal Ins.*, 48 F. Supp. 3d at 976–77 (citing *Playboy Enter.*, 549 F. App'x at 225). Accordingly, at this stage, Texas substantive defamation law applies.

## III.   AGENT IMMUNITY

Defendants argue they are immune from suit because Jones's attorneys prepared the Plea and Preservation Letter. Docket No. 12, ¶ 93. Defendants further state if the agents are not liable, neither is the principal. *Id.* Plaintiff argues that "attorney immunity does not protect attorneys 'sending out press releases or disseminating potentially defamatory allegations through the media.' " Docket No. 20 at 34 (quoting *Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 46 (Tex. 2021)). Plaintiff asserts that Defendants' attorneys disseminated the alleged defamatory statements to the media, and because the agents do not have immunity in that context, the Court does not need to consider the issues of agency.[8] *Id.*; *see also* Docket No. 1, ¶¶ 36–37.

---

comply with the statute's requirements. *See infra* Section III.B. Therefore, at this stage, whether Plaintiff has sufficiently pleaded the elements of a defamation claim is the same analysis under Texas and D.C. law. *See, e.g.*, *Canal Ins. Co. v. XMEX Transport, LLC*, 48 F. Supp. 3d 958, 976–77 (W.D. Tex. 2014) (applying Texas law after plaintiff failed to prove a conflict between Tennessee and Texas law because the differing exception in the two states' laws did not apply to the case at issue).

[8] Defendants did not address Plaintiff's arguments in their reply. *See generally* Docket No. 22. The parties did not further address the agency issue at the hearing. *See generally* Docket Nos. 40–42.

Taking the complaint's allegations as true, the Court agrees with Plaintiff that attorney immunity is not applicable at this stage. In *Landry's*, the Texas Supreme Court held that "attorney immunity attached when attorneys act on behalf of their clients" but only in the capacity of "the office, professional training, skill, and authority of an attorney." 631 S.W.3d at 51–52. Attorney immunity does not extend to statements distributed to the media. *Id.* at 51–52. Such statements, "while sometimes made by lawyers, do not partake of 'the office, professional training, skill, and authority of an attorney.' " *Id.* In fact, "[a]nyone . . . can publicize a client's allegations to the media, and they commonly do so without the protection of immunity." *Id.* Taking Plaintiff's allegations as true that Defendants distributed the Plea and Preservation Letter to the media, attorney immunity is not a basis upon which to dismiss Plaintiff's claims. *See* Docket No. 1, ¶¶ 36–37.

## IV.   DEFAMATION CLAIMS

Plaintiff accuses Defendants of both defamation per se and "common law defamation" for five different publications. Docket No. 1, ¶¶ 55–73. Defendants assert that Plaintiff's defamation claims are barred by the Texas Defamation Mitigation Act ("DMA"), some of the publications are protected under the judicial proceedings privilege, the statements are substantially true, and the statements are not defamatory. *See generally* Docket No. 12.

### A.  Defamation Legal Standard

To prevail on a defamation claim, Plaintiff must show "(1) publication of a false statement of fact to a third party, (2) the statement must concern the plaintiff and be defamatory, (3) the publication must be made with the requisite degree of fault, and (4) the publication must cause damages." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 743 (5th Cir. 2019) (quoting *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)). At the motion to dismiss stage, the falsity of the defamatory statement is presumed, but the truth of the statement is an affirmative defense. *See id.*

Determination of "[w]hether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law." *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023).

Texas recognizes several classifications of defamation. For example, Texas distinguishes between "textual defamation" and "extrinsic defamation." *Dallas Morning News v. Tatum*, 554 S.W.3d 614, 626–27 (Tex. 2018). Textual defamation "arises from the statement's text without reference to any extrinsic evidence" and thus does not contemplate "any extrinsic defamation." *Id.* at 626. Extrinsic defamation "require[s] reference to extrinsic circumstances." *Id.* A plaintiff "relying on extrinsic defamation must say so in their pleadings, whereas plaintiffs relying on textual defamation need not." *Id.* (citing *Billington v. Hous. Fire & Cas. Ins.*, 226 S.W.2d 494, 497 (Tex. Civ. App.—Fort Worth 1950, no writ)).

Within textual defamation, defamation "may be either implicit or explicit." *Id.* at 626–27. Explicit defamation occurs when "what the statement *says* and what the statement *communicates* are the same." *Id.* at 627. Alternatively, defamation by implication allows a plaintiff to raise a claim when certain facts that are "literally or substantially true, are published in such a way that they create substantially false and defamatory impression by omitting facts or juxtaposing facts in a misleading way." *Id.* (quoting *Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). In other words, "a defendant may be liable for a 'publication that gets the details right but fails to put them in the proper context and thereby gets the story's gist wrong.' " *Id.* The "gist" of a publication refers to the "main theme, central idea, thesis, or essence." *Id.* at 629. When looking at the "gist" of a publication, the court considers the publication "as a whole." *Id.* (quoting *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 437 (Tex. 2017)). That is, the court must "answer

this legal question [of defamation] from the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements." *Lilith Fund*, 662 S.W.3d at 363.

A plaintiff can also allege that implicit defamation arises "from a distinct portion of the article rather than from the article's as-a-whole gist." *Tatum*, 554 S.W.3d at 628. This "implication" refers to the "inferential, illative, suggestive, or deductive meanings that may emerge from a publication['s] . . . discrete parts." *Id.* at 629. Substantial truth "precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in details," whereas "a true implication" cannot "save a defendant from liability for publishing an otherwise factually defamatory statement." *Id.* (quoting *Turner*, 38 S.W.3d at 115).

With respect to damages, Texas has "ratif[ied] the continued usage of (and distinction between) 'defamation per se' and 'defamation per quod' as used in relation to special damages." *Id.* at 626. Defamation per se is defamation "so harmful that the jury may presume general damages." *Id.* Defamation per se is "broken down into separate categories of falsehoods." *Lipsky*, 460 S.W.3d at 596. For example, "[a]ccusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se." *Id.* (citing *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.)). To presume damages, "the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to the plaintiff's trade, business, or profession and not merely upon the plaintiff's general characteristics." *Id.*

For the fault requirement, the "status of the person alleging defamation determines the requisite degree of fault." *Walker*, 938 F.3d at 744. "A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *Id.* (citing *Lipsky*, 460 S.W.3d at 593). Actual malice requires "that the statement was made with knowledge of its falsity

or with reckless disregard for its truth." *Id.* The "constitutional focus" of the fault standard is "on the defendant's attitude toward the truth, not his attitude towards the plaintiff." *Id.* (quoting *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016)).

### B.  Plaintiff's Claims Should Not be Dismissed Under the DMA

As noted, Defendants assert that Plaintiff's claims should be barred under the Texas Defamation Mitigation Act ("DMA"). Docket No. 12, ¶¶ 94–97 (citing TEX. CIV. PRAC. & REM., §§ 73.054–55). Defendants argue that, under the DMA, Plaintiff could bring an action for defamation "*only if*: (1) the person has made a timely and sufficient request for a correction or retraction from the defendant." *Id.* Defendants state that "[n]o such demand was ever 'served' on (or sent in any manner to) the alleged publishers Defendants Jones, Cowboys, Wilkinson, Trailrunner, and Jack." *Id.* ¶ 95. Defendants further state a DMA request for correction cannot be made now because the one-year limitations period has expired for all the alleged publications. *Id.* ¶ 96.

Plaintiff responds[9] that, under Texas law, failure to comply with the DMA does not warrant dismissal of a defamation case. Docket No. 20 at 34–35. Plaintiff also asserts that she requested a sufficient clarification under the DMA as to the First and Second ESPN Articles when she "sent a letter to ESPN about the defamatory statements published in their articles." *Id.* at 37–38. At the motion to dismiss stage, the Court takes Plaintiff's request to ESPN as true. Accordingly, Plaintiff sufficiently pleads that there was a demand for correction per the DMA for the ESPN articles. Even if Plaintiff had not made this demand, however, failure to demand correction under the DMA does not warrant dismissal at this stage. Failure to comply with the DMA may limit or bar

---

[9] Plaintiff also "stands by her position D.C. law applies [sic]," but nonetheless responds to Defendants' substantive arguments regarding the DMA. Docket No. 20 at 34. As established above, Plaintiff failed to meet her burden of showing D.C. law applies. *See supra* Section II.

exemplary damages, but the applicability of the "Texas DMA defense would be more properly handled in the context of summary judgment as opposed to a motion to dismiss." *Butowsky v. Folkenflik*, No. 4:18-CV-442, 2019 WL 3712026, at *18 (E.D. Tex. Aug. 7, 2019); *see also Hogan v. Zoanni*, 627 S.W.3d 163, 176–77 (Tex. 2021) ("The plain language of the statute does not support a right to dismissal for failing to provide a sufficient request before the statute of limitations expires."). Therefore, dismissal of all claims for Plaintiff's alleged failure to comply with the DMA is not appropriate at this time.

Accordingly, Defendants' motion to dismiss all claims for failure to comply with the DMA is **DENIED**.

### C.  The Plea, Preservation Letter, and Jack Affidavit Are Not Privileged

Defendants also assert that the Plea, Preservation Letter, and Jack Affidavit are protected by the judicial proceedings privilege. Docket No. 12, ¶¶ 70, 73, 74. Plaintiff alleges Defendants waived their privilege by distributing the judicial pleading to the media. Docket No. 20 at 32–33; *see also* Docket No. 1, ¶¶ 36–37, 42.

In Texas, communications made in "the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *Landry's*, 631 S.W.3d at 46 (citing *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982)). A "due course of a judicial proceeding" includes "communications 'in serious contemplation of such a proceeding.' " *Id.* (quoting *Cantey Hanger, LLC v. Byrd*, 467 S.W.3d 477, 485 n.12 (Tex. 2015)). The parties do not dispute that the Plea, Preservation, and Jack Affidavit were drafted in the "due course of a judicial proceeding." *See generally* Docket Nos. 12, ¶¶ 70, 73, 74; 20 at 32–33. The Court agrees. The question then becomes whether Plaintiff sufficiently pleaded that Defendants waived this privilege.

Plaintiff states she sufficiently pleaded that, upon information and belief, Defendants provided these documents to the media to ensure they were picked up and that "dissemination of the [pleadings] and accompanying press release to the media [was] not protected by the judicial-proceedings privilege." Docket No. 20 at 33 (citing Docket No. 1, ¶ 36); *Landry's* 631 S.W.3d at 50. Defendants first respond that, in *Landry's,* the delivery of the notice letter to the plaintiff and applicable government agency was protected and therefore Defendants' pleadings are protected. Docket Nos. 12, ¶¶ 11, 15, 17, 70, 73–74; 22 at 12.

The court in *Landry's* was clear, however, that delivery of the privileged judicial communication to the plaintiff and a federal agency was protected because it was necessary to "set the judicial machinery in motion." 631 S.W.3d at 50. The allegation here is not that Defendants waived their privilege by filing their documents or sending them to Plaintiff, but that Defendants gave them to the media, which *Landry's* distinguishes. *Id.* at 49–51. As such, Defendants' first argument is not persuasive.

Next, Defendants state that the protected letter in *Landry's* was published *with* an accompanying press release and that, here, "Plaintiff does not allege that Defendants disseminated a press release via social media or otherwise" when the Plea, Preservation Letter, and Jack Affidavit were published. Docket No. 22 at 13. Defendants' narrow reading of *Landry's* is unpersuasive. *Landry's* notes that "defendants lost the judicial-proceedings privilege's protections when they repeated the [document's] allegations for publicity purposes 'outside the protected context within which the statements were originally made.'" 631 S.W.3d at 50. Other Texas cases have similarly held that purposeful "publication" or dissemination of a court filing may be enough to step "out of the umbrella of privilege." *See, e.g.*, *Levingston Shipbuilding Co. v. Inland West Corp.*, 688 S.W.2d 192, 196 (Tex. App.—Beaumont 1985) (holding the privilege was waived

when the party instructed "one of his attorneys to give [the filing] to the news media, which they did, resulting in extensive publication"). Further, as was noted in *Landry's*, the purpose of the judicial proceedings privilege is to "facilitate open and vigorous litigation of matters inside the courtroom" and *not* to "promote publicity or public awareness outside the courtroom." 631 S.W.3d at 49.

Taking Plaintiff's allegations as true, Defendants distributed the Plea, Preservation Letter, and Jack Affidavit to the media. *See* Docket No. 1, ¶ 36 ("Upon information and belief, the Defendants provided this [Plea] to media outlets, as they customarily do, to ensure the accusations were picked up by the media."), ¶ 37 ("This [Preservation] letter was provided to the media to be used by the media to further propagate the extortion narrative and to tie Plaintiff to other supposed bad actors . . . ."), ¶ 42 ("Defendant Jack provided an affidavit to ESPN . . . ."). Contemplating the purpose behind the privilege, Plaintiff has sufficiently pleaded that the judicial proceedings privilege can be waived by purposeful distribution of judicial communications to the media. Therefore, Defendants effectively waived the judicial proceedings privilege as to these documents.

Accordingly, Defendants' motion to dismiss the Plea, Preservation Letter, and Jack Affidavit as privileged is **DENIED**. The Court will therefore consider the merits of the alleged defamatory statements.

### D.  Alleged Defamatory Statements

Plaintiff alleges statements from five publications are defamatory: (1) the Plea; (2) the Preservation Letter; (3) the Jack Affidavit; (4) the First ESPN Article; and (5) the Second ESPN Article. The Court addresses each of these published statements in turn.

#### 1.  The Plea

The Plea refers to Jones's plea to the jurisdiction and answer to Plaintiff's state court complaint in the First Lawsuit. Docket No. 12-18. Plaintiff alleges Defendants distributed this pleading to the media and that the first two paragraphs in the introduction are defamatory. Docket No. 1, ¶¶ 58(a)–(b), 62, 67(a)–(b), 71. The paragraphs state:

> [¶1] Plaintiff, a twenty-five-year-old woman currently employed by a United States Congressman in Washington D.C., claims that Defendant [Jones] is her unacknowledged father. But before making these allegations *[Plaintiff] delivered a draft of her lawsuit to Defendant and, to borrow her phrase, asked whether he would like to 'make a deal' to 'assure that he would not be publicly or privately identified and/or declared as Plaintiff's father.'* (Pet. ¶ 9). When Defendant declined to pay, this lawsuit followed.

> [¶ 2] *Plaintiff's "let's make a deal" overtures* were made at the same time Defendant [Jones] and the *Dallas Cowboys were the targets of multiple extortion attempts. The potential source(s) of those attempted extortions, including without limitation, the Plaintiff [Alexandra Davis] and her agents*, will be the subject of other litigation which has been filed or will be instituted shortly. . . .

Docket No. 12-18 at 2–3 (emphasis added).

Plaintiff alleges these paragraphs falsely "plant this image of Plaintiff as an 'extortionist' who was conspiring with others." Docket No. 1, ¶ 62. Defendants state there is nothing literally or materially false about these paragraphs, which Plaintiff conceded in her complaint. Docket No. 12, ¶ 56.

### i.   *First Paragraph of the Plea*

For the first paragraph, Plaintiff says "the [] statement does not explicitly state Davis is an extortionist, which means the statement must be analyzed as *implicit defamation*."[10] Docket No. 20 at 21. Plaintiff is correct that there is no explicit textual defamation in the first paragraph, as

---

[10] Immediately following this assertion, however, Plaintiff states she "contends the above statement constitutes *explicit textual defamation*" but that "at a minimum, the statement's meaning is *implied from the gist of the entire publication*." *Id.* at 22. (emphasis added). Because what this statement says is not the same as what Plaintiff alleges the statement communicates, the Court analyzes this statement under implicit defamation. *See Tatum*, 554 S.W.3d at 628–30.

Plaintiff is not explicitly referred to as an extortionist. As such, the Court will look to the "gist" of the entire publication to determine whether the statement is defamatory.

Looking at the "main theme, central idea, thesis, or essence" of the publication, the first paragraph of the Plea is not defamatory. As a whole, the publication is a nine-page judicial filing which "requests that this case be dismissed for lack of jurisdiction" and primarily consists of legal arguments regarding the ripeness and justiciability of the First Lawsuit, which Plaintiff, of course, chose to file. Docket No. 12-18 at 9.

Further, the "make a deal" language is not false. Plaintiff, in the letter to the Dallas Cowboys attached to her complaint, asked Jones to participate in establishing parentage. *See* Docket No. 1-2. In that letter, Plaintiff's counsel specifically stated that if he did not hear from Jones's counsel regarding the process for establishing parentage within seven days, he would "assume" Jones had "no interest in cooperating" and would "proceed with the legal process." *Id.* A reasonable reader would interpret this letter as an offer to make a deal to "participate in genetic determination" to keep the dispute confidential.

Accordingly, a "reasonable person's perception of the entirety of the communication" would not find the Plea's first paragraph false *or* defamatory as a matter of law. *See Lilith Fund*, 662 S.W.3d at 363.

ii.    *Second Paragraph of the Plea*

Regarding the second paragraph, Plaintiff alleges the statement is explicit defamation per se because it refers to Plaintiff as a source of extortion attempts. Docket No. 20 at 23. Plaintiff states that extortion is a crime and argues that accusing someone of a crime is defamation per se. *Id.* Defendants state that "extortion" is an "opinion-derived word" and that "Plaintiff and her

lawyers did try to obtain something in exchange for keeping her bargained for promise about Davis's parentage," which, by definition, is extortion. Docket No. 12, ¶ 12.

Defendants point to *Hogan v. Winder*, where the Tenth Circuit found that "accusations of extortion are a familiar rhetorical device." 762 F.3d 1096, 1108 (10th Cir. 2014). In *Hogan*, the plaintiff brought a suit for defamation after several articles were published, one of which stated that "Chris Hogan . . . is being accused of extortion in court documents." *Id.* at 1103. The Tenth Circuit held, however, that "no reasonable reader would interpret the articles' statement that Hogan was accused of extortion to mean that Hogan was being accused of a crime or even especially sharp behavior." *Id.* at 1108. Defendants state the facts in *Hogan* are similar to the second paragraph of the Plea, where Plaintiff is referred to as a "potential source" of extortion who is "subject to other litigation." Docket No. 12-18 at 2–3. As such, a "reasonable reader knows that its resolution will await a judicial decision in 'some other' court."[11] *Id.* ¶ 63.

Plaintiff responds by asserting that Defendants use the wrong standard—when considering explicit textual defamation, "courts do not ask what a reasonable reader would think." Docket No. 20 at 23. Plaintiff points to *NRA of Am. v. Ackerman McQueen*, where the plaintiff alleged a letter written by the defendant "effectively accuses it of extorting" someone. No. 3:19-cv-2074-G, 2021 WL 3618113, at *10 (N.D. Tex. Aug. 16, 2021). In that case, the Northern District of Texas found that "[e]xtortion or blackmail is a crime under Texas and federal law," and "communications which 'charge a person with the commission of a crime' are defamatory per se." *Id.* The court noted that "Texas courts have not specifically addressed whether a communication which falsely charges an

---

[11] Defendants cite additional cases where courts held an accusation of "extortion" was not defamatory. *See Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970); *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 568 (D.C. Cir. 1999); *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001).

individual with committing extortion constitutes defamation *per se*" and, as such, saw "no reason to depart from the general rule that false allegations of the commission of a crime constitutes such a claim." *Id.*

Plaintiff, however, fails to provide the full context of the *NRA* case or explain, under *Tatum*, Texas's recent clarification of defamation per se and textual defamation. The *NRA* court did find that accusing someone of extortion is defamation per se, but, as discussed above, defamation per se relates *only* to whether a plaintiff must prove special damages. First, in *NRA*, the court determined that if the publication accused plaintiff of extortion, then it was defamation per se and damages were presumed. *Id.* Then the court conducted an implicit textual defamation analysis and determined that the letter at issue was "reasonably capable of defamatory meaning through defamation-by-gist" and that it "quite clearly carrie[d] the gist that [Defendant] . . . committed extortion or blackmail." *Id.* The letter in *NRA* "went on to succinctly state the basic elements of blackmail or extortion in relation to" the plaintiff. As such, because the "gist" of the publication accused the plaintiff in *NRA* of extortion, the defamation was defamation per se. *Id.*

The same cannot be said about the second paragraph of the Plea. Here, the sentence reads as follows: "The *potential source(s)* of those attempted extortions*, including without limitation, the Plaintiff [Alexandra Davis] and her agents*, will be *the subject of other litigation* which has been *filed or will be instituted shortly*." Docket No. 12-18 at 2–3 (emphasis added). Defendants are correct that words like "potential" do not "clearly" carry the gist that Plaintiff committed the crime of extortion. Moreover, this sentence is tucked into a nine-page judicial filing largely centered on subject matter jurisdiction, where a reasonable reader could easily "fail to notice" the accusation. In addition, there are not "additional specifics of the actions purportedly constituting the crime of extortion." *McDougal v. Fox News Network*, LLC, 489 F. Supp. 3d 174, 182

(S.D.N.Y. 2020) (citing *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. at 14). As such, the second paragraph of the Plea is not defamatory.[12]

Accordingly, the Court hereby **GRANTS WITH PREJUDICE** Defendants' motion to dismiss as to the Plea (Docket No. 12-18).

2. Jack Affidavit

The Jack Affidavit refers to an affidavit sworn by Defendant Jack that was filed in the Second Lawsuit. Docket No. 12-4. The Jack Affidavit primarily recites specific payments made by Jones, through Jack, to Plaintiff pursuant to the Settlement Agreement. Plaintiff alleges the following paragraph is defamatory:

> On November 16, 2017, shortly before Petitioner's 21st birthday, Petitioner asked me to meet at Al Biernat's, a restaurant in Dallas, Texas. At that time, Petitioner had three other trust payments remaining to be paid; and her monthly trust payments were set to expire on her 21st birthday. In the meeting, Petitioner acknowledged the Settlement Agreement and that she could not establish a paternal relationship with Respondent. *However, she requested that Respondent pay her an additional $20 million, and Respondent never agreed to that request.*

Docket No. 12-4 at 6 (emphasis added).

Defendants assert that the publication is not defamatory and is substantially true. Docket No. 12, ¶ 74. In response, Plaintiff argues the Jack Affidavit amounts to implicit textual defamation and that, "as a whole," the statement regarding Davis's request for $20 million implies that Davis was attempting to extort money from Jones. Docket No. 20 at 26–27. Plaintiff also asserts Jack published the affidavit to ESPN. *Id.* at 26; Docket No. 1, ¶ 42.

---

[12] Plaintiff is correct in that *if* the Plea was defamatory—in that it carried defamatory statements falsely accusing Plaintiff of a crime—it would likely be defamation per se and damages could be presumed. However, the gist of the Plea is not defamatory, and a reasonable reader would not read the Plea as "Plaintiff is an extortionist." As such, there can be no defamation per se.

Plaintiff alleges she never asked Defendants for money. Docket No. 20 at 12. Defendants, however, rely on the Letter, which Plaintiff admits she read to Jack at the dinner in question. Docket No. 1, ¶ 43. In the Letter, Plaintiff wrote: "I already have a figure in mind and if I get that I will be out of [Jones's] life," further stating that she knew another illegitimate child in the Jones family had received $20 million. Docket No. 22 at 5–6 (citing Docket No. 12-2 at 2, 4). Defendants argue the statements in the Jack Affidavit do not amount to a claim of defamation, whether $20 million or some other figure or amount was requested. *Id*.

First, Defendants have demonstrated that Plaintiff asked for money at the meeting with Jack in 2017. The complaint and Plaintiff's representations at the hearing confirm the Letter was drafted between four and five years ago. Docket No. 42 at 49:22–50:8; *see also* Docket No. 1, ¶ 43. Further, Plaintiff does not dispute that she read the Letter to Jack at the 2017 dinner. Docket No. 1, ¶ 43. While the relevance of Plaintiff's "demands" in 2017 may have less relevance to the filing of the First and Second Lawsuits, the Jack Affidavit specifically references the alleged request for money in the context of the 2017 dinner between Jack and Plaintiff and has nothing to do with whether Plaintiff asked Jones for money when she pursued legal action in 2022. Docket No. 12-4, ¶ 19. A reasonable person would read Plaintiff's Letter—where she stated she had a "figure in mind" that, if she received it, she would "be out of [Jones's] life"—as a request for money. Docket No. 12-2.[13] Substantial truth is a defense, even at the motion to dismiss stage,[14]

---

[13] The Letter also asked "what a reasonable amount would be" and recognized that Jack could not make such a decision on his own. Docket No. 12-2 at 4.

[14] *See, e.g.*, *Walker*, 938 F.3d at 747–48 (affirming a district court decision dismissing a defamation complaint for failure to state a claim because "Texas has adopted the substantial-truth doctrine, under which a plaintiff is precluded from recovery when a 'publication . . . correctly conveys a story's 'gist' or 'sting' although erring in details," and the alleged complaint was substantially true).

and Defendants have demonstrated that Plaintiff asked for money when she read the letter to Jack at the dinner.

With respect to the amount of money, Plaintiff states that she did not ask for $20 million at that meeting or in the Letter. Docket No. 20 at 20. It is unclear from the Letter whether Plaintiff actually demanded the specific amount of $20 million. *See* Docket No. 12-2. But "[a] statement is substantially true if it conveys the same 'gist' as the literal truth even if it errs in the details." *Butowsky v. Folkenflik,* No. 4:18-CV-442, 2019 WL 3712026, at *15 (E.D. Tex. Aug. 7, 2019) (citing *Turner*, 38 S.W.3d at 115). Defendants point to case law where the Texas Supreme Court held that erring in the amount of money demanded does not rise to defamation. *See Dolcefino v. Turner*, 987 S.W.2d 100, 115 (Tex. 1998). While still taking Plaintiff's allegations as true, the potential error in whether the demand was for $20 million does not eliminate the substantial truth that Plaintiff asked for money at the dinner with Jack in 2017. *See* Docket No. 12-2; *see also* Docket No. 1, ¶ 43. Further, the Jack Affidavit does not insinuate that Plaintiff is an extortionist. *See* Docket No. 12-4. As such, the Jack Affidavit is substantially true and not defamatory.

Accordingly, the Court hereby **GRANTS WITH PREJUDICE** Defendants' motion to dismiss as to the Jack Affidavit (Docket No. 12-4).

### 3.  Preservation Letter

The Preservation Letter is a letter Jones's attorneys sent to non-party Shy Anderson's[15] attorneys. Docket No. 12-42. The language at issue states that Jones's attorneys were looking "to investigate whether [Jones] has potential claims against [Anderson] and others for conversion (extortion) and other torts." Docket No. 12-42 at 1. The Preservation Letter names one of the

---

[15] Shy Anderson is Jones's former son-in-law, who, at the time Plaintiff filed the First and Second Lawsuits, was going through divorce proceedings with Jones's daughter. Docket No. 1, ¶ 37.

"Preservation Topics" as "[a]ll communications with Alexandra Davis or her current or former employer." *Id.* at 3. Plaintiff alleges this letter was provided directly to the media by Defendants. Docket No. 1, ¶ 37.

Defendants argue this letter is barred by the statute of limitations. Docket No. 12, ¶¶ 71–72. Plaintiff states that, although the Preservation Letter was drafted more than a year before suit was filed, it was not published by Defendants until March 31, 2022, or within a year from when the present lawsuit was filed.[16] *Id.* In Texas, defamation claims have "a one-year statute of limitations, which begins to run from the day the cause of action accrues." *Deaver v. Desai*, 483 S.W.3d 668, 674 (Tex. App. 2015) (citing TEX. CIV. PRAC. & REM. CODE § 16.002(a)). "[A] defamation claim accrues when the matter is published or circulated." *Id.* "[T]he discovery rule applies to an action for defamation if the defamatory statement is inherently undiscoverable or not a matter of public knowledge." *Id.* Plaintiff does not specifically allege when she became aware of the Preservation Letter, but, viewing the facts in Plaintiff's favor, the Court can assume the communication between attorneys was confidential until it was published by ESPN on March 30, 2022. Accordingly, Plaintiff filed this action within the one-year statute of limitations.

Next, Defendants assert that the Preservation Letter does not concern Plaintiff and merely asks for a third party, Anderson, to preserve his communications with Plaintiff. Docket No. 12, ¶ 70. Plaintiff argues this is implicit defamation and that the "context of the letter and the overall context of the controversy demonstrate the Preservation Letter continues the defamatory attacks on Davis's character." Docket No. 20 at 26. When considering the publication on the merits, however, the Preservation Letter itself is not defamatory. It is a legal document directed to Anderson, a non-party to this action and controversy. Docket No. 12-42. The Preservation Letter

---

[16] The Preservation Letter is referenced in the First ESPN Article. *See* Docket No 12-43 at 2.

does not accuse Plaintiff of extortion, and a reasonable reader would not take the "gist" of the letter to be that Plaintiff was an extortionist or view it as an attempt to blackmail Jones. *Id.* In fact, the letter's focus is not on Plaintiff but on whether Jones had a claim against Anderson for extortion or blackmail. *See id.*

Further looking to the "context" of how the letter was published, the Court turns to the First ESPN Article, where the Preservation Letter is discussed. Docket No. 12-43. The ESPN article reads, in part, as follows: "Jones' lawyer, in a March 10 letter asked *Shy Anderson*, the ex-husband of his daughter Charlotte, to preserve evidence of all communications he had with a wide number of people, including one of the lawyers for Davis, for a possible claim that *he* tried to extort Jones of money." *Id.* (emphasis added). Even in this context, the statement refers to a "possible" claim that Anderson, *not* Plaintiff, "tried to extort Jones of money." A reasonable reader would not connect communications between Davis's lawyers and Anderson's lawyers to an allegation that Plaintiff is an extortionist.

Accordingly, the Court hereby **GRANTS WITH PREJUDICE** Defendants' motion to dismiss as to the Preservation Letter. (Docket No. 12-42).

4. <u>First ESPN Article</u>

The First ESPN Article refers to an article published on March 30, 2023. Docket No. 12-43. Titled "Lawyers for woman who says Dallas Cowboys Jerry Jones is her biological father deny 'conspiracy,' " the article is primarily centered on the controversy between Plaintiff and Jones and includes statements by both parties' attorneys.[17] *Id.* The language at issue states the following:

> "This whole saga and series of recent attacks amounts to nothing more than an
> amateurish coordination among various parties to try to shake down the Jones

---

[17] The Court notes that neither ESPN nor the author of the article are defendants in this case. *See e.g.*, Docket No. 1. Therefore, the focus of alleged defamation is solely on the statement by Wilkinson within the context of the article. Docket Nos. 1, 12-43.

family for money," Wilkinson said in the statement. "Their own filing references the [Jones-Anderson] divorce case so it's clear for all to see what is really going on here.

Docket No. 12-43 at 2.

First, Defendants state Wilkinson's comment is a "protected opinion" that "utilizes rhetoric and hyperbole." Docket No. 12 at 11. Plaintiff responds that the term "shake down" is a slang term whose meaning is to extort money and that extortion is defamation per se. Docket No. 20 at 27. But this publication is not defamation per se; nowhere in the article is Plaintiff accused of being an "extortionist" or having committed extortion. *See generally* Docket No. 12-43.

Next, Plaintiff argues that the gist of the published statement is that Davis tried to extort Jones and that she "acted in concert with others in her alleged criminal activity." Docket No. 20 at 27. Defendants argue that Plaintiff's complaint references the divorce action and is based upon, at least in part, the Preservation Letter such that Defendants' commentary about Plaintiff's association with these "various parties" in the ESPN article is protected opinion that cannot be defamatory. Docket No. 12, ¶ 79.

The Court does not find the gist of the publication to be defamatory. When determining whether defamation by implication has occurred, courts conduct " 'a single objective inquiry: whether the [publication] can be reasonably understood as stating' the meaning the plaintiff proposes." *Tatum*, 554 S.W.3d at 631. Here, the article specifically states that "Jim Wilkinson declined to detail any evidence of any extortion attempt against Jones or the Cowboys, but he issued a statement." His statement is two sentences within an article where Plaintiff's own attorneys provide, at a minimum, five quoted statements with at least two additional references to Plaintiff's own court filings from the state court lawsuits. *See generally* Docket No. 12-43. Plaintiff also provided a "428-word statement" to ESPN, which prompted the article, in addition to the other

comments made by her attorneys on her behalf. *See id.* Further, the title refers to "*Lawyers for woman* who says Dallas Cowboys owner Jerry Jones is her biological father deny 'conspiracy.' " *Id.*(emphasis added). In other words, from the very beginning, an objective reader would reasonably be under the impression that Plaintiff, through her agents, is telling her side of the story. *See id.*

But even if the article could be "reasonably understood as stating" Plaintiff is an extortionist, the responsive statement from Wilkinson is rhetoric and opinion. The words "amateurish coordination among various parties to try to shake down the Jones family" are not a verifiable falsity with defamatory meaning. Wilkinson does not specify who is in coordination, *i.e.*, whether it is Plaintiff, Plaintiff's attorneys, Plaintiff and Plaintiff's attorneys, Shy Anderson, or some other party or parties attempting to get money from Jones. Further, it has already been established that, at some point, Plaintiff asked Jones, through Jack, for money, as well as his cooperation in establishing parentage. *See supra* Section III.D.2; *see also* Docket No. 12-2. Whether that "ask" was a "shakedown attempt" or a "demand" is an opinion, not a verifiable falsity.

Accordingly, the Court hereby **GRANTS WITH PREJUDICE** Defendants' motion to dismiss as to the First ESPN Article (Docket No. 12-43).

### 5. Second ESPN Article

The Second ESPN Article refers to an article published on March 31, 2022, just one day after the First ESPN Article appeared. Docket No. 12-44. This article is titled "Dallas Cowboys owner Jerry Jones paid millions to woman who filed paternity lawsuit, lawyer says." *Id.* Plaintiff

alleges several statements within this article are defamatory. Docket No. 1.[18] Defendants' motion

and Plaintiff's response narrow the focus to a few of the statements contained within the article,

which the Court addresses in turn.

The first alleged statement from the Second ESPN Article is a quote by Defendant

Wilkinson, which states as follows:

> [¶ 58(h)] "This clearly demonstrates that money has always been the ultimate goal
> here," Wilkinson said. "And sadly this is just one part of a more broad calculated
> and concerted effort that has been going on for some time by multiple people with
> various different agendas." . . .

Docket No. 12-44 at 3.

Defendants assert this statement is true because the "undisputed facts" show the ultimate

goal was money when the $20 million demand was made. Docket No. 12, ¶¶ 80–81. Plaintiff

responds that Wilkinson was not stating his own goal or opinion but asserting that her goal was

money, which is a fact that can be "verified by looking at the actions and statements of the party."

Docket No. 20 at 27–28. Plaintiff also argues that the "statement taken as a whole" implies that

Plaintiff is an "extortionist in conspiracy with other criminal actors, which is defamatory." Docket

No. 20.

The Court struggles to find that this statement is substantially false or defamatory. Plaintiff

told Defendants that she would pursue legal action if they did not respond to her genetic testing

letter. Docket No. 1-2. And it has been established that Plaintiff did ask for money in the Letter

---

[18] Plaintiff paraphrases several quotes from the Second ESPN Article in her complaint but did not
attach the actual publication. *See* Docket No. 1, ¶¶ 58, 67. For purposes of clarity and analysis, the
Court cites the actual language from the Second ESPN Article. *See* Docket No. 12-44. The
paragraph references provide citations to the original allegations in Plaintiff's complaint. In
addition, the Court does not find it necessary to address each individual quotation alleged in the
Second ESPN Article.

she gave to Jack (Docket No. 12-2), and she sought monetary relief in the Second Lawsuit. Docket No. 12, ¶ 10.

Nonetheless, at this stage, the Court must take Plaintiff's factual allegations as true that her "ultimate goal" was establishing parentage—not seeking money. In addition, the "gist" and theme of the Second ESPN Article are markedly different from the First ESPN Article. *Compare* Docket No. 12-44 *with* Docket No. 12-43. The Second ESPN Article was not initiated by Plaintiff and includes only a few responsive statements from her own attorneys. *See generally* Docket No. 12-44. Instead, the Second ESPN Article includes several statements by Jack and Wilkinson that suggest Plaintiff is someone who continues to ask Defendants for money. *See generally id.* For example, the next paragraph states:

> [¶ 58(f)] "The facts clearly show that millions of dollars have been paid," Wilkinson said, "and on top of that, a $20 million shakedown attempt was made. I think this speaks for itself as to the motives.". . .

*Id.* at 3.

Defendants argue that "shakedown" is rhetoric and hyperbole. Docket No. 12, ¶ 83. Defendants cite to *McNamee v. Clemens*, 762 F. Supp. 2d 584, 603–04 (E.D.N.Y. 2011), where a district court held that statements regarding a shakedown were "sound in opinion" and "hyperbol[e]" and did not "reasonably convey the specificity that would suggest that [defendant] or his agents were seriously accusing [plaintiff] of committing the crime of extortion." Docket No. 12, ¶¶ 82–83. Defendants also maintain that Plaintiff demanded an additional $20 million. *Id.* Plaintiff responds by arguing that the "statement taken as a whole" implies that Plaintiff demanded $20 million, which is verifiably false. Docket No. 20 at 28.

When analyzing the Jack Affidavit above, the Court explained that the specific details of the alleged "demand" do not have to be correct for a publication to carry a truthful "gist." *See supra* Section III.2. The context of the alleged defamatory "$20 million" demand in the Second

ESPN Article, however, is significantly different than how it was presented in the Jack Affidavit. In the Jack Affidavit, Jack stated that Plaintiff "requested that [Jones] pay her an additional $20 million" during the dinner meeting, which was substantially true, absent the potential error in specific details. Docket No. 12-4 at 6. Here, in the Second ESPN Article, Wilkinson elevated the allegation to "a $20 million shakedown attempt" in relation to the recent lawsuits. Docket No. 12-44. In other words, Wilkinson's comment regarding the "$20 million shakedown attempt" was no longer in the context of the 2017 dinner, when the alleged request was made, but instead was made in the context of the 2022 legal filings, which, while perhaps "substantially true," is "published in such a way that . . . create[s] a substantially false and defamatory impression." *Tatum*, 554 S.W.3d at 627.

Taking Plaintiff's allegations as true, and considering the evidence from Defendants that are central to her claims, Plaintiff asked for money in 2017, but a $20 million demand was not made, and such a demand was not made in 2021 when Plaintiff initiated the controversy by sending a letter seeking cooperation in establishing parentage to Defendants' counsel. As such, the "gist" of Wilkinson's statement in the Second ESPN Article could paint a defamatory picture of Plaintiff's actions.

Taking Plaintiff's allegations as true, the Second ESPN Article could plausibly have defamatory meaning. Accordingly, the Court considers the next element of a defamation claim concerning the Second ESPN Article.

### E.  Plaintiff is a Limited Public Figure and Failed to Plead Actual Malice

With respect to the Second ESPN Article, the Court now turns to the fault standard required to bring a defamation claim. Defendants assert that Plaintiff is a limited public figure and has failed

to plead Defendants acted with actual malice. Plaintiff maintains she is a private figure and must only plead that Defendants acted with negligence. Docket No. 20 at 29–30.

1. <u>Plaintiff is a Limited Public Figure.</u>

The Court must first determine whether Plaintiff is a public or private figure. The Supreme Court recognizes "two classes of public figures . . . general-purpose and limited-purpose public figures." *Trotter v. Jack Anderson Enter., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987) (citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 351 (1974)). "General-purpose public figures are those individuals who "achieve such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts." *Id.* A limited purpose public figure is someone who "thrust[s] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," or who "voluntarily injects [themselves] or is drawn into a particular public controversy." *Gertz*, 418 U.S. at 345, 351. The Fifth Circuit and the Texas Supreme Court[19] both apply a three-part test for determining whether someone is a limited public figure:

> (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Trotter*, 818 F.2d at 433; *see also WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998).

First, the Court must decide whether the controversy itself is public. A public controversy considers "whether persons actually were discussing some specific question." *McLemore*, 978 S.W.2d at 572. Further "if the press was covering the [issue], reporting what people were saying

---

[19] *Trotter* states that this test was adopted from the District of Columbia Circuit. 818 F.2d at 433; *see also LaPointe v. Van Note*, No. CIV.A. 03-2128 (RBW), 2006 WL 3734166, at \*6 (D.D.C. Dec. 15, 2006) (describing the test as the *Waldbaum* test).

and uncovering facts and theories to help the public formulate some judgment, the controversy is public." *Id.* Defendants and Plaintiff both state the public filing of the First Lawsuit ultimately "attracted local, national, and international attention" after the Dallas Morning News reported the First Lawsuit. Docket Nos. 12, ¶ 89; 1, ¶ 32. Plaintiff's complaint generally discusses the media's coverage of her paternity, and Defendants also state that Plaintiff herself released statements to ESPN. *See* Docket Nos. 1, ¶ 38; 12-43. The complaint also generally discusses Defendants' fame and the notoriety of the events related to Plaintiff. *See*, *e.g.*, Docket No. 1, ¶¶ 36, 53, 76–79. Defendants also contend the Dallas Cowboys franchise has a known "publicity profile and associations [that] extend gigantically to the corporate world and include corporate and charitable partnerships." Docket No 12, ¶ 89. Plaintiff responds that the filing of a lawsuit is not sufficient to create a public controversy. Docket No. 20 at 30.

The "controversy," for purposes of the limited public figure analysis, is Plaintiff seeking to establish parentage with Jones. This controversy is and has been public for some time now. Numerous news outlets have covered the topic, as evidenced by both the complaint and Defendants' motion to dismiss. *See, e.g.*, Docket Nos. 1, ¶¶ 31–32; 12, ¶¶ 37–39. In addition, Plaintiff, through her agents, has released multiple statements to the media concerning the topic. *See, e.g.*, Docket Nos. 12-43, 12-44. As in *McLemore*, here "numerous commentators, analysts, journalists, and public officials "[a]re discussing" the controversy, and "the press [are] actively covering the" issue. 978 S.W.2d at 572

Second, the Court must decide whether Plaintiff has more than a trivial or tangential role in the controversy. *Trotter*, 818 F.2d at 433. Plaintiff is at the very center of the controversy, which almost certainly would not exist if Plaintiff had not actively sought to establish parentage with Jones. According to Plaintiff's own complaint, she was aware of the implications of the Settlement

Agreement and chose to file a public legal action against Jones, a well-known public figure, anyway. Docket No. 1, ¶¶ 18, 27–19. Further, Plaintiff filed additional lawsuits, even after the First Lawsuit was covered by the media and created significant publicity. *See id.* Finally, as stated above, Plaintiff, through her agents, has released multiple statements to the media. *See, e.g.*, Docket Nos. 12-43, 12-44. Even weighing the facts in Plaintiff's favor, her own complaint shows she injected herself into the controversy and, as such, plays more than a trivial or tangential role in it.

Third, the Court finds the alleged defamation is germane to the controversy. The alleged defamation centers on whether Defendants falsely accused Plaintiff of seeking compensation or making demands in exchange for establishing parentage. This stems directly from the First Lawsuit that Plaintiff filed as well as the media coverage surrounding the controversy.

Because the controversy is public, Plaintiff plays more than a trivial or tangential role in the controversy, and the alleged defamation is germane to the controversy, Plaintiff is a limited public figure. Accordingly, Plaintiff's complaint must sufficiently plead actual malice.

### 2. Plaintiff Did Not Sufficiently Plead Actual Malice.

Defendants argue that Plaintiff, as a limited public figure, has failed to sufficiently plead actual malice. Plaintiff maintains in her response to Defendants' motion that she is a private figure. *See generally* Docket No. 20 at 21–23. Plaintiff also represented at the hearing, however, that she believes she has sufficiently pleaded actual malice. *See* Docket No. 42 at 70:17–22. To sufficiently plead actual malice, Plaintiff must have alleged that the published "statement was made with knowledge of its falsity or reckless disregard for its truth." *Walker*, 938 F.3d at 744.

In her complaint, Plaintiff pleads that Defendants' "statements were all false and made with malicious intent" and that "Defendants in making the false and defamatory statements acted not

only negligently but also acted with malice." Docket No. 1 ¶¶ 16, 19, 69. Beyond the "conclusory statement" that Defendants acted with actual malice, however, Plaintiff does not allege specific facts to demonstrate that Defendants knew the statements were false or that they acted with reckless disregard for the truth when they made them. *See generally id.* At the hearing, Plaintiff's attorney stated he "believe[d] that we have pled that it was malicious actual malice. We have pled actual malice in the pleadings." Docket No. 42 at 70:17–22. Plaintiff has not, however, pointed the Court toward any facts in the complaint that support her allegation that Defendants acted with actual malice. Taking Plaintiff's facts as true at the motion to dismiss stage does not require the Court to "credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 665. The Fifth Circuit has found that "scant assertions" without "the existence or contents of specific discussions, correspondence, or supporting documentation" can provide "an independent, standalone basis for dismissal of [Plaintiff's] defamation claims." *Walker*, 938 F.3d at 744 (affirming district court dismissal for failure to sufficiently plead facts demonstrating defendants acted with actual malice). Courts in this circuit have dismissed defamation claims for similar deficiencies. *See, e.g.*, *Corsi v. Infowars, LLC*, No. A-20-CV-298-LY, 2021 WL 2115272, at *1 (W.D. Tex. May 25, 2021), *report and recommendation adopted,* No. 1:20-CV-298-LY, 2021 WL 4955914 (W.D. Tex. June 25, 2021) (granting a motion to dismiss when there were "no allegations that lead to a reasonable inference that the Defendants acted with malice or a reckless disregard for the truth with regard to the" alleged statements).

Under Rule 12(b)(6), because Plaintiff has failed to sufficiently plead the requisite fault standard for the remaining alleged defamatory statements, Plaintiff has failed to state a claim upon which relief can be granted. Accordingly, for the remaining alleged publications, Defendants' motion to dismiss is hereby **GRANTED WITHOUT PREJUDICE**.

## V.    CONSPIRACY

The parties appear uncertain as to whether Plaintiff has brought a conspiracy charge. Defendants state "there is no actionable conspiracy where there is no underlying tort." Docket No. 12, ¶ 92. Plaintiff responds that "[b]ecause Davis has satisfactorily shown why her defamation claims should not be dismissed, the conspiracy claim stands." Docket No. 20 at 32. But Plaintiff also states she has "not plead a separate cause of action for conspiracy, as alleged by Defendants," and only "notes the defamation was a coordinated scheme or effort amongst many players." *Id.* n.16. From the face of the complaint, it does not appear that Plaintiff is asserting a conspiracy cause of action. *See generally* Docket No. 1. Accordingly, the Court takes notice of Plaintiff's representation that conspiracy is "not a separate cause of action" in this lawsuit. *See* Docket No. 20 at n.16.

## VI.    LEAVE TO AMEND

Plaintiff has not filed a separate motion for leave to amend her complaint. Plaintiff, however, asked in her response to Defendants' motion that, "[s]hould this Court conclude Davis'[s] allegations fail to state a plausible claim for relief, she requests an opportunity to amend prior to dismissal." Docket No. 20 at 38. Plaintiff restated her request at the hearing. Docket No. 42 at 70:17–24. At this stage, the Court does not find that amendment would be futile. Accordingly, the Court **GRANTS** Plaintiff leave to amend her complaint in accordance with the findings in this order.

## CONCLUSION

For the reasons state above, it is

**ORDERED** that Defendants' Motion to Dismiss (Docket No. 12) is **GRANTED-IN-PART WITH PREJDUICE** and **GRANTED-IN-PART WITHOUT PREJUDICE**. It is further

**ORDERED** that Defendants' Motion to Dismiss (Docket No. 12) is **GRANTED WITH PREJUDICE** as to the statements made in the Plea (Docket No. 12-18), Preservation Letter (Docket No. 12-42), Jack Affidavit (Docket No. 12-4), and First ESPN Article (Docket No. 12-43). It is further

**ORDERED** that Defendants' Motion to Dismiss (Docket No. 12) is **GRANTED WITHOUT PREJUDICE** as to the statements made in the Second ESPN Article (Docket No. 12-44). It is further

**ORDERED** that Plaintiff is granted leave to amend her complaint and correct the pleading deficiencies as to the claim dismissed without prejudice. Plaintiff shall refile her complaint within **twenty-one (21) days** of this order.

So ORDERED and SIGNED this 31st day of October, 2023.

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE